812 A.2d 1172

WEST CHESTER AREA SCHOOL DISTRICT, Appellant

v.

COLLEGIUM CHARTER SCHOOL, Appellee.

Bernard R. Miller and Harry I. Shreiner, Appellants

v.

Collegium Charter School, Appellee.

Supreme Court of Pennsylvania.

Argued Nov. 15, 2001.

Decided Dec. 20, 2002.

504

Joseph Michael Miller, Harrisburg, for amicus curiae, PA Dept. of Educ.

Ross A. Unruh, John L. Hall, Westchester, for West Chester Area School Dist.

Jeffrey D. Litts, New Cumberland, for amicus curiae, PA School Boards Ass'n.

Richard David Walk, Philadelphia, Guy Anthony Donatelli, Joel L. Frank, Westchester, Maura Katherine Quinlan, Camp Hill, Nancy Ellen Stuart, Philadelphia, William H. Lamb, Westchester, Philip Joseph Murren, Camp Hill, for Collegium Charter School.

William R. Lloyd, Lynne Lepore Wilson, for Miller/Schreiner ("Taxpayers").

Before ZAPPALA, C.J., and CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION

Chief Justice ZAPPALA.

These consolidated cases present issues regarding the proper interpretation of the Charter School Law (CSL).[1] Appellant West Chester Area School District (School District) and Appellants Bernard R. Miller and Harry I. Shreiner (Taxpayers) appeal from the order of the Commonwealth Court, which affirmed the decision of the State Charter School Appeal Board (CAB). The CAB had granted a charter to Collegium Charter School (Collegium) and reversed the contrary decision of the West Chester Area School District Board of School Directors (District Board). The CAB further denied the Taxpayers' petition to intervene. For the reasons that follow, we affirm the decision of the Commonwealth Court in all respects.

On November 13, 1998, Collegium, a nonprofit Pennsylvania corporation, submitted a charter school application to the District Board. A charter school is defined under the CSL as an independent, nonprofit, public school established and operated under a charter from the local board of school directors and in which students are enrolled or attend. 24 P.S. § 17–1703–A. Collegium's application requested a five-year charter pursuant to the CSL. It indicated that Collegium intended to enter into a management agreement with Mosaica Education, Inc. (Mosaica), a for-profit corporation, under which Mosaica would provide the school with educational and administrative services. It further stated that Mosaica would provide the initial funding to acquire and renovate an existing high school building and then lease it back to Collegium. Consistent with the CSL, Collegium proposed to be governed by a board of trustees, consisting of parents and community members that will have the authority to decide matters relating to the operation of the school. See 24 P.S. § 17–1716–A.(a).

The application also set forth the proposed education program, which provided for morning instruction in basic subjects

1. Act of March 10, 1949, P.L. 30, added by the Act of June 19, 1997, P.L. 225, 24 P.S. §§ 17–1701–A. to 17–1732–A.

such as reading, phonics, writing and mathematics, and afternoon instruction in the Paragon Curriculum. The Paragon Curriculum uses an interdisciplinary approach that combines history, social studies, anthropology, science, literature, the arts, character education and music. The program differed from that provided by the School District in that Collegium proposed a full day kindergarten, a longer school year (200 instead of 180 days), one hour per day more instructional time and foreign language instruction for all students beginning in kindergarten. The program also provided for student accountability measured by a national standardized test administered twice a year and individualized personal learning plans for each child.

Pursuant to Section 17–1717–A.(d) of the CSL, the District Board held public hearings on the application on December 14, 1998, January 5, 1999, and February 1, 1999.[2] Testimony was presented by Collegium, the School District administration and members of the public. On February 16, 1999, the District Board voted six to one to deny Collegium's application. The District Board issued its written opinion in support of its decision on February 22, 1999, which included findings of fact and conclusions of law.

In its opinion, the District Board indicated that it evaluated the application according to the criteria set forth in the CSL.[3]

2. Section 17–1717–A.(d) provides that the local board of school directors in which the proposed charter school is to be located shall hold at least one public hearing on the provisions of the charter application within 45 days of the receipt of an application. 24 P.S. § 17–1717–A.(d).

3. Section 17–1717–A.(e)(2) sets forth the criteria a local board of school directors employs to evaluate a charter school application. These criteria include, but are not limited to: (1) the demonstrated, sustainable support for the charter school plan by teachers, parents, other community members and students; (2) the capability of the charter school applicant, in terms of support and planning, to provide comprehensive learning experience to students pursuant to the adopted charter; (3) the extent to which the application considers the information requested in Section 1719–A. (Contents of Application) and conforms to the legislative intent outlined in Section 1702–A. (Legislative Intent); and (4) the extent to which the charter school may serve as a model for other public schools. 24 P.S. § 17–1717–A.(e)(2).

It found that Collegium failed to establish sustainable support for the charter school, considering that the district teachers opposed the application and there was minimal community support. It rejected the evidence in support of increased pupil learning as speculative. The District Board noted that although Collegium may provide some parents a "choice," it would be at the expense of either an increased tax burden on the School District taxpayers or a reduction in services to the existing public school systems.[4] It further found that since Collegium anticipates enrolling students from surrounding school districts, it should have applied for a regional charter. The District Board also opposed the relationship between Collegium and Mosaica, finding that the nonprofit prohibition in the CSL should not be circumvented by the organizational structure proposed by Collegium.

Based on these findings, the District Board denied the application, concluding that "[b]ecause the Collegium proposal will not improve pupil learning, increase learning opportunities for all pupils and encourage the use of different innovative teaching methods which will be an improvement over that which already exists in the School District, the legislative intent of the Act has not been fulfilled." District Board Opinion at 15.

Section 17–1702–A. provides that the General Assembly intended for the CSL to provide opportunities for teachers, parents, pupils and community members to establish and maintain schools that operate independently from the existing school district structure as a method to accomplish the following: (1) improve pupil learning; (2) increase learning opportunities for all pupils; (3) encourage the use of different and innovative teaching methods; (4) create new professional opportunities for teachers, including the opportunity to be responsible for the learning program at the school site; (5) provide parents and pupils with expanded choices in the types of educational opportunities that are available within the public school system; and (6) hold the schools established under the CSL accountable for measurable academic standards and provide the school with a method to establish accountability systems. 24 P.S. § 17–1702–A.

4. As discussed *infra*, charter schools are funded by the school districts in which the students reside in direct proportion to the number of resident students attending the charter school. *See* 24 P.S. § 17–1725–A.

Collegium then sought to appeal the District Board's denial. To be eligible to do so, the CSL requires the charter school applicant to file a petition containing the requisite number of resident signatures in the court of common pleas of the county in which the charter school would be located. *See* 24 P.S. § 17–1717–A.(i)(2). In accordance with this provision, Collegium filed its "Petition to Appeal" in the Chester County Common Pleas Court. Taxpayers subsequently filed a petition to intervene in the proceedings as taxpaying residents of adjacent school districts likely to be affected by Collegium's student recruitment. The trial court granted the petition to intervene. A hearing was held to determine the sufficiency of Collegium's petition to appeal pursuant to Section 17–1717–A.(i)(5) of the CSL.[5] On June 4, 1999, the trial court deemed the petition sufficient and certified that it conformed to the requirements of the CSL.

On July 1, 1999, Collegium then filed its appeal with the CAB. On that same date, the CAB held its first public meeting and appointed a hearing officer. Taxpayers thereafter filed a petition to intervene, which the CAB denied in a pre-hearing order. The parties submitted briefs and oral argument was conducted. On August 27, 1999, the CAB voted to reverse the District Board's decision to deny Collegium's charter school application and direct the District Board to grant the application and sign Collegium's charter pursuant to Section 17–1720–A.[6] The CAB further reaffirmed its decision to deny Taxpayers' petition to intervene.

On September 7, 1999, the CAB issued its own written findings of fact and conclusions of law in support of its August 27, 1999 vote. Initially, the CAB rejected the School District's

---

5. Subsection 1717–A.(i)(5) provides that the court shall issue a decree establishing only the sufficiency or insufficiency of the petition. If sufficient, the decree shall be transmitted to the CAB for review.

6. This section provides, *inter alia,* that upon approval of a charter application under Section 17–1717–A. (Establishment of charter school), a written charter shall be developed which shall contain the provisions of the charter application and which shall be signed by the local board of school directors of a school district. 24 P.S. § 17–1720–A.

contention that Collegium's petition to appeal should be quashed as premature or dismissed as waived. It also rejected the School District's contention that the CAB's standard of review was that of an appellate court. The CAB concluded that Section 17–1716–A.(6) requires it to give "due consideration" to the District Board's findings and articulate its reasons for agreeing or disagreeing with those findings.

On the merits of the appeal, the CAB found that Collegium demonstrated sustainable support for the charter school from parents, community members and students, notwithstanding the fact that the district teachers opposed the application. The CAB concluded that the contents of the application conformed to the legislative intent outlined in the CSL and that Collegium will serve as a model school because of its innovative curriculum and school schedule. It found that the fact that a charter school intends to enroll students from other districts does not require the applicant to apply for a regional charter. Rather, it stated that applicants for charter schools may select whether they are seeking a regional or a single district charter, depending on where the facility will be located.

Regarding the proposed contractual relationship between Collegium and Mosaica, the CAB found that the CSL does not prohibit a charter school from contracting with a for-profit entity to provide services to the charter school as long as the trustees of the charter school maintain ultimate control of the school. It found no evidence establishing that the contract with Mosaica, if implemented, would deprive the trustees of ultimate control of Collegium. It further addressed the Taxpayers' petition to intervene. It concluded that as taxpayers from an adjacent school district, they possessed no statutory right and had no other interest that would confer upon them a right to intervene in the proceeding.

The School District was notified of the CAB's decision on August 27, 1999, the day the vote was taken. That same day, the School District moved for a stay of the decision, which the CAB denied. The CSL provides that once the CAB decides to reverse the District Board's decision, the local board of di-

rectors of the school district has ten days to grant the application and sign the written charter, or else the charter will be deemed approved and signed by the chairman of the CAB. 24 P.S. § 17–1717–A.(i)(9). On August 30, 1999, the School District filed a petition for review in Commonwealth Court, noting its uncertainty as to whether the ten-day triggering event was the CAB vote to reverse the District Board or the CAB's written decision. Nevertheless, the District Board did not sign the charter by September 7, 1999, which was ten days after the CAB vote.

As a result, Collegium requested that CAB Chairman, Eugene W. Hickock, sign the charter. In response, the District Board forwarded Chairman Hickock a "conditional charter" signed by the District Board that differed significantly from the provisions of the charter application. On September 29, 1999, Chairman Hickock signed Collegium's charter. The charter stated that the board of trustees must operate the school in accordance with the CSL and in conformity with the application submitted.[7]

The School District and Taxpayers filed separate appeals from the CAB's order. The Commonwealth Court consolidated the appeals and affirmed the decision of the CAB. *West Chester Area School District v. Collegium Charter School,* 760 A.2d 452 (Pa.Cmwlth.2000).[8] The Court first determined that the CAB did not err by failing to quash or dismiss Collegium's appeal as premature. As to the appropriate standard of review, the Commonwealth Court found that Section 17–1717–A.(i)(6) of the CSL provides for *de novo* review by the CAB. It held that by giving the CAB the right to disagree with the District Board and requiring it to specifically articulate its reasons for doing so, the General Assembly has unquestionably granted the CAB the authority to substitute its own

7. Shortly after the CAB's decision was announced, the School District sought to stay the CAB's decision pending appeal to the Commonwealth Court. The Commonwealth Court granted the stay and Collegium filed an emergency application in this Court for review of the stay. On September 28, 1999, this Court reversed the stay entered by the Commonwealth Court.

8. Senior Judge McCloskey noted his dissent.

findings and independent judgment for that of the local school board.

The Commonwealth Court also agreed with the CAB that the CSL does not require Collegium to seek a regional charter merely because it intended to recruit students who do not reside in the district. It relied on provisions of the CSL that allow the charter school to enroll non-resident students on a space-available basis, 24 P.S. § 17–1723–A.(c), and permit all resident children in this Commonwealth to attend a charter school. 24 P.S. § 17–1723–A.(a). Regarding the Taxpayer's Petition to Intervene, the court held that the CSL does not afford the Taxpayers the right to participate in the appeal process. It found that the Taxpayer's claimed harm, *i.e.,* increased taxes or decreased educational services, is based solely on speculation and that Taxpayer's interests are too remote and indirect to warrant intervention.

The Commonwealth Court also rejected the School District's claim that Collegium is a mere shell for Mosaica, a for-profit entity, rather than a nonprofit corporation. It noted that the CSL grants charter schools all powers necessary for carrying out its charter, including the express power to acquire real property by purchase or lease and the power to make contracts and leases for the procurement of services, equipment and supplies. 24 P.S. §§ 17–1714–A.(a)(3) and 17–1714–A.(a)(5). It agreed with the CAB that there is no evidence to indicate that the proposed agreement between Collegium and Mosaica would deprive Collegium's trustees of the ultimate control of the school.

Finally, the court ruled that the Chairman of the CAB did not abuse his discretion under the CSL when he signed the charter for Collegium on September 29, 1999. Initially, it held that the ten day period for the District Board to grant the charter pursuant to Section 17–1717–A.(i)(9) began to run on August 27, 1999, when the CAB voted to reverse the District Board's decision and the School District received actual notice of that decision, as opposed to September 8, 1999, when the District Board received the CAB's written opinion and reversal order. The court concluded that the District Board did not

sign the charter within ten days of August 27, 1999, and therefore Chairman Hickock was statutorily required to do so. Alternatively, it held that the charter that the District Board eventually submitted to Chairman Hickock was invalid as it contained conditions that were inconsistent with the CSL.

■ Our Court granted allowance of appeal to address four issues raised by the School District and joined in argument by the Taxpayers (hereinafter collectively referred to as "Appellants"), as well as a separate issue raised solely by the Taxpayers. Because these issues involve interpretation of the CSL, they are issues of law and our review is plenary. *Phillips v. A–Best Products*, 542 Pa. 124, 665 A.2d 1167, 1170 (1995). As we address these issues, we keep in mind that in construing statutory language, "[w]ords and phrases shall be construed according to rules of grammar and according to their common and approved usage." 1 Pa.C.S. § 1903.

■ The first issue raised by Appellants is whether the CSL requires the CAB to employ a traditional appellate standard of review, *i.e.*, determine whether an error of law has been committed, constitutional rights have been violated, or findings of fact are supported by substantial evidence. *See* 2 Pa.C.S. § 754(b) (Local Agency Law). Appellants argue that the Commonwealth Court erroneously interpreted Section 17–1717–A.(i)(6) of the CSL as authorizing the CAB to create new findings of fact while conducting a *de novo* review[9] of the District Board's record. They assert that because the CAB did not establish that the District Board's findings were

---

9. Black's Law Dictionary defines "de novo" as "anew; afresh, a second time." Black's Law Dictionary 435 (6th ed.1990). The Commonwealth Court has aptly noted that there is not one procedure that constitutes *de novo* review. Rather, particular statutes set forth procedures that run the gamut from excluding all previous testimony to permitting the adjudicator, in his or her discretion, to receive no additional testimony. *Cordorus Stone & Supply Co., Inc., v. Kingston*, 711 A.2d 563 (Pa. Cmwlth.1998). The court cogently noted that "[t]he *sine qua non* of *de novo* review is not that the person or body conducting the review hear testimony anew; rather it is that such person or body possess and exercise the authority to arrive at an independent judgment on the matter in dispute." *Id.* at 566. We agree with this characterization.

unsupported by the evidence, it improperly reversed the District Board's decision to deny the charter application.

Section 17–1717–A.(i)(6) provides, in its entirety, as follows:

In any appeal, the decision made by the local board of directors shall be reviewed by the appeal board on the record as certified by the local board of directors. The appeal board shall give due consideration to the findings of the local board of directors and specifically articulate its reasons for agreeing or disagreeing with those findings in its written decision. The appeal board shall have the discretion to allow the local board of directors and the charter school applicant to supplement the record if the supplemental information was previously unavailable.

24 P.S. § 17–1717–A.(i)(6).

Appellants argue that by requiring the CAB to give "due consideration" to the District Board's findings and by restricting the CAB's review to the "record as certified by the local board of directors," the General Assembly intended for the CAB to give deference to the District Board's findings, rather than make independent findings of its own. They contend that *de novo* review would result in the CAB giving *no consideration* to the District Board's findings, a result inconsistent with the statutory discretion granted to local school boards. According to Appellants, the CAB only retains "original jurisdiction" over a charter school application when the District Board fails to act. It relies on Section 17–1717–A.(g), which provides that a local board's failure to act on an application allows the applicant to file its charter school application as an appeal to the CAB, with the CAB evaluating the application based on the same statutory criteria utilized by the local board. Thus, Appellants maintain that although Section 17–1717–A.(g) gives the CAB "original jurisdiction," Section 17–1717–A.(i)(6) does not.[10]

10. Appellants further contend that this Court has consistently employed the words "due consideration" as a term of art used to explain the deference required of a court exercising appellate review. *See Yuhas v. Schmidt,* 434 Pa. 447, 258 A.2d 616, 620 (1969) (noting that the appellate standard of review of a chancellor's decision is "whether a

■ Appellants' claims are not persuasive. The plain language of the CSL directs the CAB to specifically articulate its reasons for "agreeing or disagreeing" with the District Board's findings. Simply stated, substantial evidence review does not involve agreement or disagreement with findings. *See, e.g. Bullock v. Building Maintenance, Inc.,* 6 Pa.Cmwlth. 539, 297 A.2d 520, 522 (1972) (stating that whether the appellate court agrees or disagrees with the board's finding of fact, the court has no power to set aside the board's findings if there is substantial evidence to support them). Further, Section 17–1717–A.(i)(6) grants the CAB discretion to permit the parties to supplement the record with previously unavailable information. Such directive is inconsistent with traditional appellate review. Moreover, the CSL specifically articulates that "[a]ll decisions of the appeal board shall be subject to appellate review *by the Commonwealth Court.*" 24 P.S. § 17–1717–A.(i)(10) (emphasis added). Had the Legislature intended the CAB to also utilize an appellate standard of review, it could have similarly provided. Finally, we note that the composition of the CAB supports a finding of *de novo* review. The CAB is not comprised of attorneys capable of conducting a legal examination of the evidence, but rather consists of persons who have a perspective on public education. *See* 24 P.S. § 17–1721–A.(a) (stating composition of CAB as: a parent, a school board member, a certified teacher, a faculty or administrative employee, a business person, and a member of State Board of Education).

■ Thus, we hold that the CAB must apply a *de novo* standard of review when entertaining appeals from a District

judicial mind, on due consideration of the evidence, as a whole, could reasonably have reached the conclusion of the chancellor"); *Masciantonio Will,* 392 Pa. 362, 141 A.2d 362, 367 (1958) (same); *Rock v. Pyle,* 720 A.2d 137, 140 (Pa.Super.1998) (noting that the appellate standard of review in an equity matter is "whether a judge could reasonably have reached the conclusion of the trial court after due consideration of the evidence"). Appellants' reliance on these cases is misplaced. Merely because the words "due consideration" appear in the recitation of an appellate standard of review does not convert the statutory language employed in Section 17–1717–A.(i)(6) into the same standard. Such a position ignores the remaining language employed in the CSL, which is absent in the aforementioned cases.

Board's denial of a charter school application. As the Commonwealth Court aptly held, such review requires the CAB to give "appropriate consideration" to the findings of the District Board, while making an independent determination as to the merits of the charter school application.[11] As the CAB in the instant case considered each finding of the District Board and articulated its agreement or disagreement, it did not err by making an independent determination as to the merits of the application.

We note that our holding as to *de novo* review is consistent with our decision in *Belasco v. Board of Public Education*, 510 Pa. 504, 510 A.2d 337 (1986). *Belasco* involved an appeal to the Secretary of Education from a decision of a School Board where no additional testimony was taken. On appeal to our Court, the issue was whether the standard of review applicable to the Secretary of Education is limited to traditional appellate review or whether the Secretary is to conduct a *de novo* review of the School Board's decision.[12] In holding that *de novo* review was required, we noted that the School Board who hears and adjudicates a case involving the dismissal of a professional employee is not an "independent body." *Id.* at 342. Thus, we held that minimum requirements of due process demand that a litigant have, at some stage of a proceeding, a neutral fact-finder. *Id.* at 343. Similarly, a District Board who decides whether to grant or deny a charter school application incurs financial obligations if the charter is granted. Thus, it cannot be said to be an "independent body" and the minimum requirements of due process require that the

11. This holding is consistent with the Commonwealth Court's subsequent decisions in *Keystone Central School District v. Sugar Valley Concerned Citizens*, 799 A.2d 209 (Pa.Cmwlth.2002), *School District of York v. Lincoln–Edison Charter School*, 772 A.2d 1045, 1048 (Pa. Cmwlth.2001), and *Souderton Area School District. v. Souderton Charter School Collaborative*, 764 A.2d 688, 694–695 (Pa.Cmwlth.2000).

12. The relevant statute in *Belasco*, Section 1131 of the Public School Code, 24 P.S. § 11–1131, provided that the Secretary of Education shall review the official transcript of the record of the hearing before the school board, may hear and consider such additional testimony as he may deem advisable, and shall enter a just and proper order either affirming or reversing the action of the school board.

charter school applicant have a neutral fact finder in the CAB.[13]

■ Appellants' second issue is whether the CAB Chairman either abused his discretion or erred as a matter of law when he deemed the charter approved and executed a separate charter for Collegium on September 29, 1999. In order to resolve this issue, the Court must determine whether the ten-day "deemed approved" period in Section 17–1717–A.(i)(9) begins on the date the School Board received actual notice of the CAB's decision to reverse the District Board's denial of the charter application (the day of the CAB vote—August 27, 1999)[14] or the date the CAB issued its written decision (September 7, 1999). This also brings into question whether the District Board's submission of a "conditional charter" on September 17, 1999, was valid.

Section 17–1717–A.(i)(9) provides as follows:

A decision of the [CAB] to reverse the decision of the local board of directors shall serve as a requirement for the local board of directors of a school district or districts, as appropriate, to grant the application and sign the written charter of the charter school as provided for in section 1720–A. *Should the local board of directors fail to grant the application and sign the charter within ten (10) days of notice of the reversal of the decision of the local board of directors, the charter shall be deemed to be approved and shall be signed by the chairman of the [CAB].*

24 P.S. § 17–1717–A.(i)(9) (emphasis added).

The Commonwealth Court held that actual notice of the CAB vote triggered the ten-day period in which the School District must approve the charter. It relied on the fact that the CSL does not require written notice or notice of a written

13. As we hold that the CAB properly applied a *de novo* review, we need not address Appellants' claim that there was substantial evidence to support the District Board's findings.

14. The Commonwealth Court held that "[i]t is indisputable that the School District had actual notice of the CAB's decision to reverse the District Board on August 27, 1999." *West Chester School District v. Collegium Charter School,* 760 A.2d at 472.

decision. The Commonwealth Court ruled that because the School District's Charter was not executed within ten days after the School District was notified of the CAB's decision to grant the charter, the CAB Chairman did not abuse his discretion in executing a separate charter. Alternatively, the court held that even assuming the School District Charter was timely executed, it was invalid because it imposed conditions on Collegium that were inconsistent with the CSL and were not included in the CAB's order granting Collegium's charter.[15]

We agree with the Commonwealth Court on both grounds. The plain language of Section 17–1717–A.(i)(9) provides that the ten-day period begins when the School District receives notice of the CAB's reversal. While we acknowledge that Appellants' interpretation of Section 17–1717–A.(i)(9) may provide certainty as to the date of notice, it is simply not the policy the General Assembly adopted by the statutory language it employed. Had the Legislature intended the ten-day period to begin on the date the CAB issued its written decision, it would have so provided.

Appellants do not dispute that the School District received notice of the CAB's decision on August 27, 1999. Rather, they rely on the fact that the Chairman of the CAB informed the School District that the "deemed approved" period would not

15. The School District Charter included the following conditions: The charter required Collegium to provide the School District with monthly financial reports. R. at 419a. The CSL only requires charter schools to provide annual reports to the local school board. 24 P.S. § 17–1728–A.(b). The charter also required Collegium to provide the School District with individual educational programs and notice of recommended assignments for each special education student. R. at 420a. The CSL does not contain such a requirement. The charter stated that the charter could be revoked for "any" violations of the charter. R. at 422a. The CSL provides that a charter may only be revoked for one or more "material violations" of the charter. 24 P.S. § 17–1729–A.(a)(1). The charter further provided that if the CAB's decision is reversed or stayed, Collegium shall immediately return to the School Board any funds disbursed by the School Board to Collegium. The CSL provides that if a charter is revoked, the charter school must first dispose of any liabilities of the charter school and then distribute any remaining assets on a proportional basis to the school districts that initially supplied the funds. 24 P.S. § 17–1729–A.(i).

begin until a written decision was filed.[16] They further rely on the fact that the School District's appeal of the CAB's decision to the Commonwealth Court was quashed as premature because it was filed before the CAB issued a written reviewable decision. Thus, they conclude that a written decision is likewise required to trigger the ten-day period in Section 17–1717–A.(i)(9). The statutory language, however, does not support this position. What is necessary to render the CAB's decision reviewable in court is not synonymous with what is necessary to trigger the "deemed approved" period in Section 17–1717–A.(i)(9). The mandate of the statute is clear—the School District must approve a charter within ten days of when it is notified of the CAB's decision to reverse the local school board's decision. As it did not do so here, the CAB Chairman did not abuse his discretion in executing a separate charter.

■ We also agree with the Commonwealth Court's alternative holding regarding the District Board's inability to impose restrictive conditions upon a charter granted by the CAB. Appellants argue that reasonable charter conditions ensure that a local school board will retain the ability to provide effective oversight of a charter school located within its territory and protect public funds. Regardless of the purported wisdom of such an approach, the General Assembly simply did not provide for it. Although the CSL implicitly recognizes that conditions may be placed on the grant of a charter, such conditions must be consistent with the statutory provisions.[17] To hold to the contrary would defeat the CSL's

16. It does not appear that the School District relied on such representation as it conceded in its petition for review filed in Commonwealth Court that the ten-day period may have begun on August 27, 1999.

17. Section 17–1729–A.(a)(1) empowers the local board of school directors to revoke or renew a charter based upon a material violation of "any of the *conditions*, standards or procedures contained in the written charter signed pursuant to section 1720–A." 24 P.S. § 17–1729–A.(a)(1) (emphasis added). The term "conditions" must be interpreted so as to refer to conditions in the charter approved by the CAB. This is not to say that a District Board may never impose conditions upon a charter. Any condition imposed must, however, be in accordance with the provisions of the CSL. In fact, the charter executed by

stated purpose to operate charter schools independently and free from excessive regulation. *See* 24 P.S. § 17–1701–A. (stating that the General Assembly intends for charter schools to operate independently from the existing school district structure); 24 P.S. § 17–1715–A.(1) (stating, except as otherwise provided in this article, charter schools are exempt from statutory requirements established in the act, from regulations of the State board and the standards of the secretary not specifically applicable to charter schools).

■ Appellants' third issue is whether a charter school applicant must seek a regional charter if it intends on recruiting and enrolling students from outside the school district where the charter school is located. Appellants contend that a regional charter is required because a non-chartering school district will have no vote in the adoption of the charter and will not be able to use the methods of accountability afforded to the chartering school district by the CSL. They emphasize that although each school district with students enrolled at a charter school is required to divert tax money to that charter school, only the district to which the charter application was submitted has the authority under the CSL to hold the charter school accountable for how that money is spent.

Appellants raise legitimate concerns regarding the non-chartering school district's inability to vote on the application and its lack of authority to utilize the accountability methods afforded to the chartering district. This statutory procedure may result in the non-chartering school district incurring financial obligations to the charter school when it has no control over the decisions being made on behalf of the charter school. The School District's concerns, however, should be directed to the General Assembly. The role of our Court is solely to interpret the language of the CSL and not to delve into the underlying wisdom of the statutorily created procedure. That said, we find that the CSL unquestionably directs the applicant to file the charter school application in the

the CAB contained two permissible conditions: (1) that the charter school operates as a charter school in accordance with the CSL; and (2) that the charter school operates in conformity with the application.

district where the facility is to be located and grants accountability over the charter school only to the chartering school district.

The various statutory provisions controlling this inquiry provide that a charter school may enroll students from outside the district that grants the charter, 24 P.S. § 17–1723–A.(c), and that all resident children in this Commonwealth may attend a charter school. 24 P.S. § 17–1723–A.(a). Most significantly, the CSL further provides that "[a]n application to establish a charter school shall be submitted to the local board of school directors of the district *where the charter school will be located.*" 24 P.S. § 17–1717–A.(c) (emphasis added). Similarly, Section 17–1718–A., entitled "Regional charter school," states that the applicant shall file "for a charter to the board of directors of any school district *in which the charter school will be located.*" 24 P.S. § 17–1718–A. (emphasis added).[18]

As to accountability, Section 17–1728–A.(a) gives the "local board of school directors" ongoing access to the charter school's records and facilities to ensure that the charter school is complying with the charter and the CSL. It also makes the "local board of school directors" responsible for conducting an annual assessment of the charter school and a more comprehensive review at the time of renewal of the charter. Section 17–1728–A.(b) requires a charter school to submit an annual report to the "local board of school directors" to assist the board's review of the charter school. Furthermore, Section 17–1729–A.(a) authorizes the "local board of school directors" to revoke or refuse to renew a charter based on the enumerated statutory factors. Eliminating any doubt in the matter, Section 17–1703–A. defines "local board of school directors" as "the board of directors of a school district in which a proposed or an approved charter school is *located.*" 24 P.S. § 17–1703–A. (emphasis added).

Consistent with this view, the Commonwealth Court in the instant case cogently noted:

18. The requirement of holding a public hearing likewise applies only to the "local board of school directors in which the proposed charter school is to be located." See 24 P.S. § 17–1717–A.(d).

[U]nless the charter school will be located in more than one school district, which is not the case here, the CSL does not set forth any particular set of circumstances that would require a charter school applicant to apply as a multi-district regional charter school rather than a single district charter school. Instead, the CSL leaves that choice completely up to the applicant, regardless of the anticipated geographic makeup of the student body. Further, the [School District's and Taxpayer's] claimed need for further accountability provides no reason to rewrite the law. Because any Pennsylvania resident may attend any charter school, 24 P.S. § 17-1723-A.(a), and because any charter school may draw students from outside its district, 24 P.S. § 17-1723-A.(c), every charter school applicant could expect to admit nonresident students. Indeed, the General Assembly contemplated and provided for this possibility in the CSL and, thus, could have held charter schools accountable to any paying school district if the General Assembly thought it necessary. That the General Assembly did not do so indicates its belief that charter schools already are held sufficiently accountable to monitoring entities and reflects the General Assembly's desire to free charter schools from unnecessary layers of bureaucracy. See 24 P.S. §§ 17-1702-A, 17-1715-A.(1).

*West Chester Area School District v. Collegium Charter School*, 760 A.2d at 463 (footnotes omitted).

■ Appellants' fourth issue is whether Collegium's proposed contractual agreement with Mosaica, a for-profit corporation, violates the provisions of the CSL.[19] Appellants contend

19. At the time the charter school application was submitted, Mosaica and Collegium had not yet entered into a management agreement, but instead relied upon an agreement that Mosaica had previously entered into with a different charter school. All parties and tribunals throughout this appeal have similarly relied on this model agreement when examining the issues of this case. This Court has done so as well. We recognize that the Commonwealth Court has condemned the practice of allowing a school district to grant a charter based only upon a "model" agreement between the charter school and the for-profit entity offering administrative and educational services, as opposed to a finalized version of an agreement between the parties. *School District of the City*

that Collegium's charter should have been denied because Mosaica completed the application, the application obligated Collegium's trustees to contract with Mosaica and the application was submitted without the approval or input of the trustees. They emphasize that the trustees were not even appointed at the time the charter school application was submitted to the District Board for review. They rely on the definitions of both "charter school" and "regional charter school" in Section 17–1703–A., which state not only that a charter school must be "organized" as a "public, nonprofit corporation," but also specifically prohibit the granting of a charter to "any for-profit entity."

Appellants' claims fail as Collegium's articles of incorporation establish that Collegium was organized as a non-profit corporation under Pennsylvania law. R. at 149a. Collegium is controlled by an independent board of trustees who retain the ultimate authority over the general operation of the school. Collegium's bylaws and charter application clearly state that "[the board of trustees] has ultimate responsibility to determine general, academic, financial, personnel and related polices deemed necessary for the administration and development of the Charter School in accordance with its stated purposes and goals." Collegium Charter School Application at 31, R. at 144a. This is consistent with Section 17–1716–A. of the CSL, entitled "Powers of board of trustees," which states that "the board of trustees of a charter school shall have the authority to decide matters related to the operation of the school ... subject to the school's charter." 24 P.S. § 17–1716–A.(a).

The CSL also expressly permits a charter school to "[m]ake contracts and leases for the procurement of services, equipment and supplies." 24 P.S. § 17–1714–A.(a)(5). That is precisely what occurred here. The management agreement contracted for educational and administrative services to be

of York v. Lincoln–Edison Charter School, 772 A.2d 1045 (Pa.Cmwlth. 2001). We note, however, that the propriety of the reliance on the model agreement was never raised in this appeal. Thus, any references to the management agreement in this opinion refer to the model agreement.

performed by Mosaica. Contrary to Appellants' contentions, nothing in the management agreement supports the claim that Collegium was not an independent, nonprofit corporation or that Mosaica would retain the ultimate control over operation of the charter school. To the contrary, the agreement affords Mosaica all authority and power necessary to undertake its obligations under the agreement, *"except in cases wherein such authority may not be delegated by the Code and other applicable laws and resolutions."* Management Agreement at 1.04, R. 183a (emphasis added); see *also* Management Agreement at 12.02(c), R. at 193a. Further, the agreement expressly clarifies that the charter school "is not a division or a part of [Mosaica]," and that neither party has the power to bind or legally operate the other. *Id.* at 3.01, R. at 184a. It goes on to state that Mosaica "will not have any role or relationship with the Charter School that, in effect, substantially limits the Charter School's ability to exercise its rights, including cancellation rights under this Agreement." *Id.* at 3.02, R. at 184a.

Finally, the CSL does not preclude a for-profit entity from completing an application for a charter school. As noted, it permits a charter school to be "established" by "any corporation," which includes a for-profit corporation. 24 P.S. §§ 17–1717–A.(a), 17–1718–A.(a). In fact, the CSL implicitly acknowledges that the board of trustees will not be formed at the time the application is submitted. Section 17–1719–A.(4) states that an application to establish a charter school shall include "[t]he proposed governance structure of the charter school, including a description and method for the appointment or election of members of the board of trustees." 24 P.S. § 17–1719–A.(4). Thus, as the Commonwealth Court noted, it follows that all of the terms listed for inclusion in the charter application will be determined without input from the board of trustees. *West Chester Area School District v. Collegium Charter School,* 760 A.2d at 470, see *also Brackbill v. Ron Brown Charter School,* 777 A.2d 131, 137 (Pa.Cmwlth. 2001).

■ Our last issue for review is whether the CAB abused its discretion by denying the Taxpayers' petition to intervene. As noted, the Taxpayers are not residents of West Chester, but reside in adjacent school districts located within ten miles of the West Chester School District. They contend that a taxpayer has standing to challenge the grant of a charter by another school district if the charter school will depend on recruiting and enrolling students from their school district and the charter application is not submitted for approval to their school district. The Taxpayers assert that the transfer of tax dollars from their school district to Collegium mandated by Sections 17–1725–A. and 17–1726–A. acts as a "tax" imposed by Collegium onto the adjoining school districts and their taxpayers without representation.[20] They conclude that the effect of the "Collegium tax" will result in either increased taxes or reduced educational programs offered by their own school district. This argument mirrors that set forth in support of the claim regarding a regional charter and is likewise meritless.

■ It is well established that granting or denying a petition to intervene is within the sound discretion of the agency involved. *Pennsylvania Dental Association v. Commonwealth of Pennsylvania Insurance Department,* 512 Pa. 217, 516 A.2d 647 (1986). The Taxpayers asserted that they were eligible to intervene pursuant to Section 35.28(a) of the General Rules of Administrative Practice and Procedure. Section 35.28, entitled "Eligibility to intervene," states in pertinent part:

A petition to intervene may be filed by a person claiming a right to intervene or an interest of such nature that intervention is necessary or appropriate to the administration of the statute under which the proceeding is brought. The right or interest may be one of the following:

**20.** Section 17–1725–A. requires the district of residence of.each student enrolled in a charter school to pay the charter school a statutorily formulated amount per student. Section 17–1726–A. requires the district of residence to provide transportation to its students attending a charter school outside their district in accordance with Section 1361 of the Public School Code, 24 P.S. § 13–1361.

(1) A right conferred by statute of the United States or this Commonwealth.

(2) An interest which may be directly affected and which is not adequately represented by existing parties, and as to which petitioners may be bound by the action of the agency in the proceeding . . . . or,

(3) Other interest of such nature that participation of the petitioner may be in the public interest.

1 Pa.Code § 35.28(a).

The Taxpayers have failed to satisfy any of these requirements. First, it is undisputed that there is no statutory right for a taxpayer to challenge a charter granted by an adjoining school district. Second, the Commonwealth Court properly held that the Taxpayers were not "directly affected" by the CAB's decision to grant the charter, nor were they "bound" by such decision. The Taxpayers possessed no rights or obligations as a result of the grant of Collegium's charter. Their claim of "taxation without representation" is based on mere conjecture as there is no evidence of record to support such a claim here. Finally, the Taxpayers' interests are not sufficient to make intervention "in the public interest." The arguments set forth by the Taxpayers were raised by the West Chester School District and considered and rejected by the CAB and the Commonwealth Court. The Taxpayers have failed to demonstrate that they would have presented additional evidence or arguments in the CAB proceedings if the petition to intervene had been granted.

In rejecting this claim, the Commonwealth Court aptly noted:

Indeed, Taxpayers' interests are several steps removed from any action by the CAB and, thus, will be affected only if numerous possibilities are realized following the grant of Collegium's charter. In fact, the order to grant Collegium's charter binds only the School District; it does not require students from Taxpayers' school districts to attend Collegium. Although Collegium intends to recruit students from Taxpayers' school districts, there is no assurance that any

particular number of students will actually choose to attend Collegium. Moreover, even if students from outside the School District do attend Collegium, there is no proof that the loss of students will have an adverse financial impact on Taxpayers' districts. Finally, even assuming that Taxpayers' school districts suffer such financial consequences, there is no way of determining whether the added costs would be extensive enough to require the local school boards in Taxpayers' districts to either raise taxes or reduce services. In short, ordering a school district to grant a charter to a charter school will not directly affect Taxpayers. The students in Taxpayers' school districts still decide for themselves if they wish to enroll at Collegium, and the local board of directors in each school district determines whether taxes will be raised, whether there will be a reduction in services or both. These decisions are not made by the CAB.

*West Chester Area School District v. Collegium Charter School*, 760 A.2d at 466 (footnotes omitted).

As recognized by the Commonwealth Court, the Taxpayers are not left without representation. Their interests in the expenditure of their tax dollars are protected by their respective School Districts and they can voice their opinion through use of the ballot box. Accordingly, the Commonwealth Court correctly held that the CAB did not abuse its discretion in denying Taxpayers' petition to intervene.[21]

Having resolved all the claims raised by the School District and the Taxpayers, we affirm the order of the Commonwealth Court.

Former Chief Justice FLAHERTY did not participate in the consideration or decision of this case.

Justice NIGRO files a dissenting opinion.

---

**21.** We further reject the Taxpayers' claim that the CAB was bound by the trial court's order, which allowed the Taxpayers to intervene before that court. As previously discussed, the proceeding before the trial court was not on the merits of the charter application, but was merely to determine the sufficiency of the signatures appearing on the School District's petition to appeal. See 24 P.S. 17–1717–A.(i)(5).

Justice NIGRO, dissenting.

As I believe that the Charter School Law ("CSL"), 24 P.S. §§ 17–1701–A. to 17–1732–A., required Collegium Charter School ("Collegium") to apply for a regional charter, I respectfully dissent.

As the majority acknowledges, the CSL sets up two separate charter application procedures, one for local charter schools and one for regional charter schools. A local charter school application must be "submitted to the local board of school directors of the district where the charter school will be located," 24 P.S. § 17–1717–A.(c), and only that local board of school directors is empowered to vote on the application. *See generally* 24 P.S. § 17–1717–A.(e). In contrast, in section 17–1718–A.(b), the CSL states with respect to regional charter schools that:

> The boards of school directors of one or more school districts may act jointly to receive and consider any application for a regional charter school, except that any action to approve an application for a charter or to sign a written charter of an applicant shall require an affirmative vote of a majority of all the directors of each of the school districts involved. The applicant shall apply for a charter to the board of directors of any school district in which the charter school will be located.

24 P.S. § 17–1718–A.(b).

In my view, the only way to give meaning to section 17–1718–A.(b) is to interpret it as providing an approval mechanism for a proposed charter school that is specifically intended to serve a greater region than the school district in which it is located.[1] Moreover, I believe that a regional charter is re-

1. This interpretation is supported by the provision of the CSL regarding a school district's obligation to provide transportation to charter school students, which states:

> Students who reside in the school district in which the charter school is located *or who are residents of a school district which is part of a regional charter school* shall be provided transportation to the charter school on the same terms and conditions as transportation is provided to students attending the schools of the district.

quired for such schools, because if the CSL were to leave the choice of local or regional application "completely up to the applicant," Slip Op. at 18 (quoting *West Chester Area Sch. Dist. v. Collegium Charter Sch.*, 760 A.2d 452, 463 (Pa. Cmwlth.2000)), the regional charter provisions would be rendered meaningless because no applicant would ever voluntarily subject itself to the magnified scrutiny of the regional charter school application procedures.[2] *See* 1 Pa.C.S. § 1921(a) ("Ev-

24 P.S. § 17–1726–A.(a) (emphasis added). By separately addressing the transportation needs of "students who reside in the school district in which the charter school is located" and "residents of a school district which is part of a regional charter school," the General Assembly makes clear that a regional charter school presumptively serves not only students within the district in which it is located, but also those outside the local district.

**2.** The Commonwealth Court suggested two circumstances in which an applicant might find it advantageous to apply as a regional charter school. The majority, however, does not adopt this reasoning, and I find neither circumstance proposed by the Commonwealth Court to be persuasive.

First, the Commonwealth Court hypothesized that "[b]ecause single district charter schools must physically be in the district granting the charter, electing to apply for such a charter could restrict the school's choice of facility sites." 760 A.2d at 463 n. 28. However, what the Commonwealth Court apparently failed to recognize is that the CSL contemplates a charter school choosing a facility site prior to submitting its application for a charter. *See* 24 P.S. § 17–1719–A.(11)(requiring the applicant to include in its application "[a] description of and address of the physical facility in which the charter school will be located and the ownership thereof and any lease arrangements."); *but see Brackbill v. Ron Brown Charter Sch.*, 777 A.2d 131 (Pa.Cmwlth. 2001) (applicant need not have contracted for facility at time of application and CAB has discretion to permit change of facility if school board delay results in facility's unavailability). Moreover, an application for a regional charter school, like a local charter application, must be submitted to the "school district in which the charter school will be located." 24 P.S. § 1718–A.(b). Accordingly, a charter school applicant cannot use the regional application process to postpone its decision as to the district in which its school will be located.

Second, the Commonwealth Court opined that "because single district charter schools must give preference to qualified students from the chartering district, schools designed to attract a multi-cultural student body or draw students from various socio-economic groups may be thwarted in their desire if the student demand is sufficient from the chartering school district." *Id.* (citation omitted). Putting aside the question of whether the CSL would prohibit such an admission policy because it would discriminate on a basis that would be "illegal if used by a school district," 24 P.S. § 17–1723–A.(b)(1), I cannot accept that

ery statute, if possible, is to be construed to give effect to all its provisions."). Furthermore, I note that it is only with the participation of all of the school districts from which the charter school intends to actively recruit students that there can be a meaningful assessment as to whether the charter school will advance the CSL's purpose to, among other things, "improve pupil learning," "increase learning opportunities," and "encourage the use of different and innovative teaching methods" in each of the specifically targeted districts. 24 P.S. § 17–1702–A; *see also* 24 P.S. § 1717–A.(e)(2)(iii) (requiring school boards to "evaluate the extent to which the charter application ... conforms to the legislative intent outlined in section 1702–A").

In an attempt to give meaning to the regional charter school provisions, without requiring a prospective charter school specifically designed to serve a multi-district region to obtain a regional charter, the majority adopts the Commonwealth Court's conclusion that the joint approval procedures for a regional charter must be used when a charter school "will be located in more than one school district." [3]  Op. at 1184

the General Assembly included a regional charter provision specifically to benefit charter schools who sought to serve a multi-cultural population. This is particularly so when, under the Commonwealth Court's and majority's own interpretation of the statute, a local charter school could achieve this goal of multi-culturalism by simply focusing its recruiting efforts on a multi-cultural mix of students in both its own district and surrounding regions.

3.  In holding that a multi-district regional charter school need not apply for a regional charter, the majority relies in large part on its findings that "the CSL unquestionably directs the applicant to file the [regional] charter school application in the district where the facility is to be located and grants accountability over the charter school only to the chartering school district." Op. at 1183. I fail to see the significance of either of these findings to the majority's holding. First, that a regional charter school is only required to physically file its charter application in the district in which it will be located in no way impacts on the rights of certain other school districts to consider and vote on the application pursuant to section 17–1718–A.(b). In addition, with respect to the majority's comments regarding accountability, I note that the issue currently before the court is not whether the school districts served by a regional charter school have the right to monitor the school's performance after the charter has been granted, but rather whether such school districts have the right to initially consider and

(quoting *West Chester*, 760 A.2d at 463). However, as an initial matter, I see nothing in the statute that appears to anticipate the submission of a charter application for the chartering of a school that has facilities in more than one district.[4] In fact, the statute specifically states that a charter school application must set forth "[a] description of and address of *the* physical facility in which the charter school will be located," 24 P.S. § 17–1719–A.(11) (emphasis added), which, on its face, appears to foreclose the possibility of a multi-facility application. *See* 24 P.S. § 17–1717–A.(i)(3) (petition to appeal denial of a charter school application must state "the proposed location of the charter school."); 24 P.S. § 17–1717–A.(i)(5) (same petition is to be presented to "the court of common pleas of the county in which the charter school would be situated."). Moreover, even assuming for the sake of argument that the CSL permitted the bundling of several interrelated schools in a single charter application, I can conceive of no situation in which an applicant would opt to file such an application when its approval would require the consensus of a number of boards of school directors. Rather, the applicant would surely choose to submit a separate local application for each school facility, given that each such application would require the approval of only one board of school directors.

Accordingly, as I cannot agree with the majority's interpretation of section 17–1718–A.(b), I would hold that where, as here, a charter school applicant plans at the outset to actively recruit students from select school districts other than that in which the school is physically located, the CSL requires the applicant to apply for a regional charter, thereby giving those school districts a much deserved voice in the denial or approv-

vote on the charter application. Accordingly, the school district or districts to which the charter school is subsequently accountable is simply of no moment here.

4. It is conceivable that a charter school would have a single facility that straddles the border of two school districts, but I do not understand the majority and Commonwealth Court to be referring to such an anomaly. Rather, I understand them to be interpreting "regional charter school" to be some sort of umbrella organization that operates a collection of schools in separate locations.

al of the charter.[5]  I recognize that a local charter school is not prohibited from enrolling nonresident students if there is insufficient enrollment from the local school district. *See* 24 P.S. § 1723–A.(a).  However, I do not believe that this affords a charter school applicant the right to seek a local charter from a school district from which it has no expectation of generating sufficient interest, only to turn around and fill the school with students from districts which have had no say in the approval process and which will not benefit from the unanticipated siphoning of students and funds from its school system.

---

**5.**  Under the majority's interpretation, a charter school could locate immediately within the border of a school district from which it expects very little community resistance. After obtaining a charter from that district, it could focus its recruiting efforts in a neighboring district, and, in fact, enroll the majority of its students from that neighboring district.  As the local charter school application process does not require that the effects on neighboring districts be considered, there is nothing to guard against this arrangement having a devastating effect on the neighboring district.  In essence, the majority permits charter school applicants to forum shop for the most charter school-friendly school board, without regard for those communities that the school will actually affect.  I simply do not believe that the General Assembly intended such a result.