IN THE COMMONWEALTH COURT OF PENNSYLVANIA

School District of Pittsburgh,    :
                Petitioner    :
                    :
          v.    :    No. 598 C.D. 2015
                    :    Submitted: December 9, 2015
Provident Charter School For    :
Children With Dyslexia,    :
              Respondent    :


BEFORE:    HONORABLE DAN PELLEGRINI, President Judge[1]
                HONORABLE BONNIE BRIGANCE LEADBETTER, Judge[2]
                HONORABLE RENÉE COHN JUBELIRER, Judge
                HONORABLE ROBERT SIMPSON, Judge
                HONORABLE MARY HANNAH LEAVITT, Judge[3]
                HONORABLE P. KEVIN BROBSON, Judge
                HONORABLE PATRICIA A. McCULLOUGH, Judge

OPINION
BY JUDGE LEAVITT                            FILED: February 26, 2016

The School District of Pittsburgh petitions for review of an adjudication of the State Charter School Appeal Board (Appeal Board) granting a charter to Provident Charter School for Children with Dyslexia (Provident). In doing so, the Appeal Board concluded that Provident's application for a charter

---

[1] This case was assigned to the opinion writer on or before December 31, 2015, when President Judge Pellegrini assumed the status of senior judge.

[2] This case was assigned to the opinion writer on or before January 31, 2016, when Judge Leadbetter assumed the status of senior judge.

[3] This case was assigned to the opinion writer before January 4, 2016, when Judge Leavitt became President Judge.

met the requirements of the Charter School Law[4] and reversed the School District's contrary conclusion. We affirm.

## Background

In November 2013, Provident submitted an application to the Board of Directors of the School District of Pittsburgh (School District) for the grant of a charter for its proposed school, which would focus on students with dyslexia in grades two through eight. Provident's application contained 105 petitions of support with over 800 undated signatures from residents in or near Pittsburgh. The application also included over 50 letters of support from parents, educators, and other professionals and one student. At the School District's public hearing, 20 individuals spoke in favor of Provident's application. On February 26, 2014, the School District denied Provident's charter application.[5]

---

[4] Act of March 10, 1949, P.L. 30, added by the Act of June 19, 1997, P.L. 225, *as amended*, 24 P.S. §§17-1701-A – 17-1751-A.

[5] The School District listed the following deficiencies in the application as reasons for the denial:

- Does not provide the School District of Pittsburgh with expanded choices in the types of educational opportunities currently being offered.
- Failure to demonstrate sustainable support by way of current petitions and letters of support from teachers, parents, students and the community.
- Failure to include all the information requested in section 1719-A and conform to the legislative intent outlined in section 1702-A.
- Failure to describe a complete and comprehensive curriculum that is aligned to state standards.
- Does not provide sufficient information regarding a continuum of services to meet the needs of all students, including students with disabilities, English Language Learners and at-risk students.
- Failure to establish that the proposed charter school is financially viable.
- Failure to demonstrate that the charter school can serve as a model for other schools in the District.

Reproduced Record at 625.

On March 14, 2014, Provident resubmitted a revised, 400-page application. Reproduced Record at 636-1027 (R.R. ___).[6] The revised application offered: (1) additional written support for the charter school plan by teachers, parents, other community members and students; (2) expanded choices for students in the School District; (3) new procedures for the suspension or expulsion of students; (4) a new professional development plan; (5) a new admissions policy; and (6) a new proposed curriculum. Joint Stipulation of Undisputed Facts and Law at 2, ¶7.

> Provident's stated mission is
>
> to offer families an alternative educational program for their children who are diagnosed with dyslexia and are at-risk of educational failure due to academic difficulties manifested through limited language processing skills and whose instructional needs are not met in a traditional setting.

R.R. 647-48. To that end, Provident proposes "specially designed instruction for students with dyslexia that will intensively and specifically address their individual needs at their own instructional level." R.R. 644. According to the revised application:

> The hallmarks that define and distinguish the commitment of [Provident] to the continuous growth and achievement of children with dyslexia include, but are not limited to these:

---

[6] Pursuant to Section 1717-A(f) of the Charter School Law,

> [a]t the option of the charter school applicant, a denied application may be revised and resubmitted to the local board of school directors.

24 P.S. §17-1717-A(f). Because this appeal involves Provident's revised charter application, we discuss only that application.

1.  Implementation of multisensory instruction using derivatives of the Orton-Gillingham approach to language arts taught by Orton-Gillingham certified teachers

2.  Individualization of instruction based on students' developmental needs

3.  Teaching students in small, flexible skill groups with targeted instruction available among 8 tiers based on students' knowledge and skills, at each level

4.  Recognition of parents as partners in their children's education

5.  Maintenance of an overall school average of a 6:1 student to adult ratio

6.  Incorporation of project-based learning and development and implementation of interdisciplinary, theme-based units of instruction

7.  Partnering with families in the development and delivery of education

8.  Fostering self-discipline, self-respect and self-defense through a martial arts Tae Kwon Do program

9.  Establishment of a fine arts program to include music, art and theater experiences

10. Implementation of a conversational Spanish [program] and the study of Latin to promote vocabulary development

11. Incorporation of assistive technology tools such as, but not limited to, Kurzwell Text To Speech Literacy Software, Dragon Naturally Speaking Voice Recognition Software as well

4

as other instructional technology applications such as, but not limited to, SMART Boards, SMART Interactive Solutions, Microsoft Office and internet application

12. Employment of a two year teacher looping cycle in Levels 3-4, 5-6 to promote stronger student/teacher bonding

13. Development of students' social consciousness through community service activities

14. Application of formative assessment techniques and providing regular, consistent feedback to students and parents

15. Partnering with local universities to place student teachers including an incentive program

16. Addressing the needs of at-risk students defined as those who are at risk of educational failure because of academic difficulties such as, but not limited to, language processing and dyslexia

R.R. 645-46, 963.

Provident will market the school's special focus to prospective students and their parents. Nevertheless, Provident will accept any applicant, even one for whom the special programs will have no relevance. Accordingly, Provident attested in its revised application that it

will not discriminate on any basis, including intellectual ability, measures of achievement or aptitude, athletic ability, disability, English language proficiency, race, creed, gender, sexual orientation, national origin, religion, or ancestry or other protected class.

5

R.R. 984.  There will be no admission tests or requirements.  Applicants will be accepted on a first-come, first-served basis.  If there are more applicants than available spaces, a lottery system will be used for admission.

Provident's proposed pre-enrollment form requests certain information, including the child's name and date of birth and "whether special programs are required."  R.R. 720, 985.  Provident explained that the pre-enrollment form will not be used to

> deny enrollment or otherwise discriminate in its admission policies or practices on the basis of a child's disability or the child's need for special education or supplementary aids or services.

R.R. 987.  Rather, the pre-enrollment form will help Provident determine "whether the school is oversubscribed and a lottery must be held."  R.R. 985.  When an offer of admission is made, parents have three weeks "to participate in an orientation process and to complete the enrollment process."[7]  R.R. 722.  Thereafter a separate registration and enrollment form will be used to effect an enrollment.

Provident's revised application described its plan to involve the community in the school as follows:

> The founding coalition, along with the Board of Directors, represents a cross section of parents and professionals with an interest in serving the needs of children with dyslexia.  Many are actively involved in organizations and agencies whose mission it is to work with families who have children with dyslexia.

---

[7] If they do not, admission will be forfeited.

Among the agencies represented by the coalition are these important institutions that serve children with dyslexia such as, but not limited to:

- International Dyslexia Association http://interdys.org/

- Pittsburgh Branch of the International Dyslexia Association http://pbida.org/

- Masonic Temple, Total Learning Center http://totallearningcenter.com/

- The Watson Institute http://www.thewatsoninstitute.org/

- The Laughlin Center http://www.laughlincenter.org/

- [Provident] has received numerous letters of support from many of these organizations, professionals who work in the field of special education and from parents and families whose children are dyslexic. These letters are included in the Appendix at the end of this application. [Provident] will continue to request letters of support and will present them at the Public Hearing that will be scheduled within 45 days of the school district's receipt of this application.

R.R. 711.

The application form has a heading entitled "Community Involvement in Planning Process." In response Provident stated that it will

involve parents, families and communities in a variety of committees as developed by the [Provident] Board and administrative team. [Provident] will work to engage and involve parents, families and community members to promote collaboration, communication and conflict resolution.

[Provident] also will have a robust program for parents/guardians of prospective students to become involved in

7

the development of [Provident]. [Provident] will initiate partnerships with local, state wide and national organizations to promote best practices based on evidence, expertise and experience.

Representative groups include, but are not limited to,

- Charter, Parochial, Private and Independent schools
- International Dyslexia Association http://interdys.org/
- Masonic Temple, Total Learning Center http://totallearningcenter.com/
- Pittsburgh Branch of the International Dyslexia Association http://pbida.org/
- Pittsburgh Public Schools http://www.pps.k12.pa.us/Page/1
- The Laughlin Center http://www.laughlincenter.org/
- The Watson Institute http://www.thewatsoninstitute.org/
- Total Learning Centers http://www.totallearningcenter.com/
- Troy Hill Citizens, businesses and community groups
- University of Pittsburgh http://pitt.edu

R.R. 970.

With regard to community support for the charter school, Provident incorporated the evidence of support from its initial application and submitted over 100 new petition signatures, which were dated, from individuals residing within a

8

4-block radius of Provident's proposed site, as well as 14 letters in support of its revised application.[8]

On April 28, 2014, the School District held a second public hearing on Provident's application. Seven individuals spoke in favor of Provident's charter application. Two days later, the School District's Board denied Provident's charter application, finding it to be deficient in the following areas:

- Sufficient support from residents of the School District of Pittsburgh

- Expanded Choices

- Considering all information requested in [S]ection 1719-A [of the Charter School Law, 24 P.S. §17-1719-A] and conforming to the legislative intent outlined in [S]ection 1702-A [of the Charter School Law, 24 P.S. §17-1702-A].

- Meeting the needs of all students

---

[8] The letters in support state:

I, _____ [insert author's name] **am writing to express my support for the Provident Charter School**, which I understand is applying for a Charter in the Troy Hill neighborhood. I recognize that having a charter school for children with dyslexia in the metropolitan area will be a great service to local families seeking educational support for their children with language processing challenges.

As a citizen of the community, I would welcome the opportunity to have [Provident Charter School] located in Troy Hill. A school such as this will ensure the continued use of the North Catholic High School as a center for learning in our community. Additional benefits of having the school will be to help bolster our local economy and provide high-quality job opportunities for our region.

Western Pennsylvania needs a public school choice that will provide the thousands of children with dyslexia in our region with a free, appropriate public education that will arm them with the tools they need to succeed in school and in life. Providing public school choice for parents whose children are at risk for educational failure increases opportunities for students and strengthens the fabric of our community.

R.R. 941 (emphasis in original).

R.R. 1762.[9]

With respect to community support, as required by Section 1717-A(e)(2)(i) of the Charter School Law,[10] the School District found that "[m]any of the signatures [on the petition] were from outside the City of Pittsburgh and only a few of the letters of support were from School District of Pittsburgh parents who would enroll their child(ren) in the proposed charter school." R.R. 1762.

With respect to expanded choices, as required by Section 1702-A(5)[11] of the Charter School Law, the School District found that Provident fell short because its educational programs were already offered in the School District, including other charter schools in Pittsburgh.[12]

---

[9] In its May 1, 2014, letter to Provident, the School District stated that one of the bases for the denial was Provident's "[f]ailure to serve as a model for other schools in the District." R.R. 1761. However, the School District's actual written denial did not explain this point, and the School District did not raise it in the appeal to the Appeal Board. It is waived.

[10] Section 1717-A(e)(2)(i) states that the local board of school directors must evaluate an application for a charter based on

> demonstrated, sustainable support for the charter school plan by teachers, parents, other community members and students, including comments received at the public hearing held under subsection (d).

24 P.S. §17-1717-A(5).

[11] Section 1702-A(5) states, in relevant part, as follows:

> It is the intent of the General Assembly, in enacting this article, to provide opportunities for teachers, parents, pupils and community members to establish and maintain schools that operate independently from the existing school district structure as a method to accomplish all of the following:
>
> ***
>
> (5) Provide parents and pupils with expanded choices in the types of educational opportunities that are available within the public school system.

24 P.S. §17-1702-A(5).

[12] The School District asserted that it uses teacher looping, extended school days, flexible groups, Orton-Gillingham multi-sensory instruction, assistive technology, use of assessments for

**(Footnote continued on the next page . . .)**

With respect to the involvement of community groups and partnerships, as required by Section 1719-A(8) of the Charter School Law,[13] the School District found Provident's application lacking because it did not include "agreements, contracts or memoranda of understanding with community partnerships." R.R. 1763.

Next, the School District concluded that Provident "failed to demonstrate that it is prepared to meet the needs of all students." R.R. 1764. In the School District's view, once Provident agreed to accept all students, not only those diagnosed with dyslexia, it should have revised the educational programming, staffing, and curriculum to address this different student body. Further, Provident did not have a written policy for screening students to satisfy the Child Find[14] requirements.

Finally, the School District found that Provident's admission policy was discriminatory in violation of Section 1723-A(b) of the Charter School Law;[15]

---

**(continued . . .)**

accountability, employment of teachers with preparation and experience teaching students with dyslexia, inclusive practices, an extended school year, expanded extracurricular choices, and the promotion of self-advocacy. R.R. 1763.

[13] It states, in relevant part, as follows:

> An application to establish a charter school shall include all of the following information:

> ***

> (8) Information on the manner in which community groups will be involved in the charter school planning process.

24 P.S. §17-1719-A(8).

[14] *See* 34 C.F.R. §300.111(a) (setting forth the "child find" mandates, including the requirement that all children residing in the Commonwealth who have disabilities be identified, located and evaluated and that methods be employed to determine which children are receiving needed special education and related services).

[15] Section 1723-A(b) of the Charter School Law provides that:

**(Footnote continued on the next page . . .)**

22 Pa. Code §711.7;[16] and the Pennsylvania Fair Opportunities Act.[17]  Specifically, the School District found it "inappropriate to request 'whether special programs are

---

**(continued . . .)**

(1) A charter school shall not discriminate in its admission policies or practices on the basis of intellectual ability, except as provided in paragraph (2), or athletic ability, measures of achievement or aptitude, status as a person with a disability, proficiency in the English language or any other basis that would be illegal if used by a school district.

(2)  A charter school may limit admission to a particular grade level, a targeted population group composed of at-risk students, or areas of concentration of the school such as mathematics, science or the arts.  A charter school may establish reasonable criteria to evaluate prospective students which shall be outlined in the school's charter.

24 P.S. §17-1723-A(b).

[16] Regarding enrollment in charter schools:

(a) A charter school or cyber charter school may not deny enrollment or otherwise discriminate in its admission policies or practices on the basis of a child's disability or the child's need for special education or supplementary aids or services.

(b) Subject to subsection (a), a charter school or cyber charter school may limit admission to a particular grade level or areas of concentration of the school such as mathematics, science or the arts.  A charter school or cyber charter school may establish reasonable criteria to evaluate prospective students which shall be outlined in the school charter.

(c) A charter school or cyber charter school may not discriminate in its admission policies or practices on the basis of intellectual ability.  Admission criteria may not include measures of achievement or aptitude.

22 Pa. Code §711.7.

[17] Act of July 17, 1961, P.L. 776, *as amended*, 24 P.S. §§5001-5010.  Section 4 of the Pennsylvania Fair Educational Opportunities Act states, in relevant part, as follows:

(a) Except as provided in section 9, it shall be an unfair educational practice for an educational institution--

(1) To exclude or limit, or otherwise discriminate, because of race, religion, color, ancestry, national origin, sex, handicap or disability, against any student or students seeking admission as students to such institutions:  Provided, That it shall not be unfair educational practice for any educational institution to use criteria

**(Footnote continued on the next page . . .)**

12

required'" on the pre-enrollment form. R.R. 1764. It concluded that the requested information served "no legitimate purpose at the pre-enrollment phase." *Id.*[18]

## State Charter School Appeal Board

Provident appealed to the Appeal Board.[19] After a *de novo* review of the record evidence and law, the Appeal Board reversed the School District's denial of Provident's application for a charter. The Appeal Board concluded that Provident's application satisfied the requirements of the Charter School Law.[20]

---

**(continued . . .)**

> other than race, religion, color, ancestry, national origin, sex, handicap or disability in the admission of students.
>
> (2) To make any written or oral inquiry prior to admission concerning or designed to elicit information as to the race, religion, color, ancestry, national origin, sex, handicap or disability of a student seeking admission to such institution.

24 P.S. §5004(a)(1),(2).

[18] The Appeal Board reversed the School District's findings regarding Provident's suspension and expulsion procedure, professional-development plan, curriculum and extracurricular-activities documentation. However, the School District has not appealed these rulings of the Appeal Board.

[19] Provident fulfilled the signature-petition process required by Section 1717-A(i)(2) of the Charter School Law, which states, in relevant part, as follows:

> In order for a charter school applicant to be eligible to appeal the denial of a charter by the local board of directors, the applicant must obtain the signatures of at least two per centum of the residents of the school district or of one thousand (1,000) residents, whichever is less, who are over eighteen (18) years of age.

24 P.S. §17-1717-A(i)(2). In August 2014, the Court of Common Pleas of Allegheny County entered a consent order declaring that Provident had submitted a petition with over 1,000 valid signatures and could file its appeal with the Appeal Board.

[20] Section 1717-A(i)(6) of the Charter School Law sets forth the Appeal Board's review as follows:

> In any appeal, the decision made by the local board of directors shall be reviewed by the appeal board on the record as certified by the local board of directors. The appeal board shall give due consideration to the findings of the local board of directors and specifically articulate its reasons for agreeing or disagreeing with

**(Footnote continued on the next page . . .)**

13

First, with respect to community support, the Appeal Board explained that an applicant must show a "reasonable amount of support in the aggregate" from teachers, parents, students and other community members. Appeal Board Adjudication at 25 (quoting *In re Independence Charter School Initiative*, CAB Docket No. 2000-2). Provident did this with 60 letters of support of the initial and revised applications; 100 petition signatures from residents within a 4-block radius of the school site offered in the revised application; and the statements of 20 individuals at the first public hearing coupled with statements from an additional four people at the second public hearing. Appeal Board Adjudication at 25. The Appeal Board rejected the School District's contrary conclusion.[21]

Second, with respect to Provident's ability to meet the needs of all students, the Appeal Board explained that an applicant satisfies this duty when it provides "a roadmap to the school's operation, goals, teaching strategies and learning methodology."[22] Appeal Board Adjudication at 26 (quoting *Thurgood*

---

**(continued . . .)**

those findings in its written decision. The appeal board shall have the discretion to allow the local board of directors and the charter school applicant to supplement the record if the supplemental information was previously unavailable.

24 P.S. §17-1717-A(i)(6). The Appeal Board "must apply a *de novo* standard of review when entertaining appeals from a District Board's denial of a charter school application." *West Chester Area School District v. Collegium Charter School*, 812 A.2d 1172, 1180 (Pa. 2002).

[21] Notably, Provident supplemented the record before the Appeal Board by providing a letter of support dated September 15, 2014, authored by Anthony Benvin, Ph.D., on behalf of the Board of Directors of Troy Hill Citizens, Inc., a 40-year-old non-profit, community-development corporation.

[22] *See* Section 1717-A(e)(2)(ii) of the Charter School Law, 24 P.S. §17-1717-A(e)(2)(ii) (authorizing a local board of school directors to evaluate an application for a charter based on "[t]he capability of the charter school applicant, in terms of support and planning, to provide comprehensive learning experiences to students pursuant to the adopted charter.").

14

*Marshall Academy Charter School*, CAB Docket No. 2001-05). It did not matter that Provident's application did not include a written policy for screening students for Child Find because the Charter School Law does not require this. Noting that Provident's application included information for transitioning students with disabilities to a traditional classroom, the Appeal Board found that Provident "is prepared to meet the needs of potential new students, including students with disabilities and English language learners" and that the curriculum was in all ways sufficient. Appeal Board Adjudication at 27.

Third, with respect to the expanded choices requirement, the Appeal Board explained that the General Assembly intended charter schools to

> increase learning opportunities for all pupils, encourage the use of different and innovative teaching methods, create new professional opportunities for teachers, and provide parents and pupils with expanded choices in the types of educational opportunities that are available within the public school system.

Appeal Board Adjudication at 28. The Appeal Board explained that a charter school must show differences, not a totally novel program, to satisfy the expanded choices requirement. Provident's revised application detailed those differences that included, *inter alia,* individualized instruction, a 6:1 student ratio and the use of the Tae Kwon Do program to foster self-discipline, self-respect, and self-defense. R.R. 645-46, 963. The Appeal Board concluded that Provident's innovative learning environment was distinct from what was available in the School District.

Fourth, with respect to the involvement of community groups in the school planning process, the Appeal Board rejected the School District's holding that Section 1719-A(8) of the Charter School Law required the production of

15

agreements, contracts or memoranda of understanding with community groups. Rather, the applicant need only set forth the information mandated by the Charter School Law, *i.e.*, information on how community groups will be involved in the planning process. Provident's revised application did so. It detailed involvement of parents in the development of the charter school; partnerships with local, statewide, and national organizations; and identified businesses and community groups with which it will partner.

Finally, with regard to Provident's admission policy, the Appeal Board noted that Provident's revised application eliminated its original plan to limit enrollment to children with dyslexia. Instead, Provident will open its school to all children, regardless of whether they have dyslexia. The question on Provident's pre-enrollment form about special needs was sought for holistic purposes, *i.e.*, to enable it to prepare an individualized program, and not to discriminate. The Appeal Board noted that under *Central Dauphin School District v. Founding Coalition, Infinity Charter School*, 847 A.2d 195 (Pa. Cmwlth. 2004), a charter school may focus on a targeted group of students so long as its doors are open to all.

In accordance with these findings, the Appeal Board granted Provident's appeal and ordered the issuance of a charter to Provident. The School District then petitioned for this Court's review.[23]

---

[23] Appellate review of an Appeal Board adjudication considers whether constitutional rights were violated, whether errors of law were committed, or whether the decision is not supported by substantial evidence. *Ronald H. Brown Charter School v. Harrisburg City School District*, 928 A.2d 1145, 1147 n.6 (Pa. Cmwlth. 2007). "Substantial evidence" is defined as "relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Carbondale Area School District v. Fell Charter School*, 829 A.2d 400, 405 (Pa. Cmwlth. 2003).

On appeal, the School District challenges each of the Appeal Board's conclusions enumerated above. It contends that they are not supported by the record evidence and that the Appeal Board erred because it did not specifically articulate its reasons for each determination, as required by Section 1717-A(i)(6) of the Charter School Law.[24] We address the School District's arguments *seriatim*.

We begin with the issue of sustainable support. An applicant for a charter must show "demonstrated, sustainable support for the charter school plan by teachers, parents, other community members and students, including comments received at the public hearing…." 24 P.S. §17-1717-A(e)(2)(i). In addressing that standard, we have explained that:

> In determining whether an application has established demonstrated, sustainable support, we previously stated our agreement with the [Appeal Board] that such support "is to be measured in the aggregate and not by individual categories" and

---

[24] Section 1717-A(i)(6) states:

> In any appeal, the decision made by the local board of directors shall be reviewed by the appeal board on the record as certified by the local board of directors. *The appeal board shall give due consideration to the findings of the local board of directors and specifically articulate its reasons for agreeing or disagreeing with those findings in its written decision.* The appeal board shall have the discretion to allow the local board of directors and the charter school applicant to supplement the record if the supplemental information was previously unavailable.

24 P.S. §17-1717-A(i)(6) (emphasis added).

Because a school district has a financial interest in the outcome of a charter grant or denial, "the minimum requirements of due process require that the charter school applicant have a neutral fact finder in the [Appeal Board]." *West Chester Area School District v. Collegium Charter School*, 812 A.2d 1172, 1181 (Pa. 2002). The Appeal Board "must apply a *de novo* standard of review when entertaining appeals from a District Board's denial of a charter school application." *Id*. at 1180.

17

concluded that "[f]ailure to demonstrate strong support in any one category is not necessarily fatal to [the] charter school application."

*Carbondale Area School District v. Fell Charter School*, 829 A.2d 400, 405 (Pa. Cmwlth. 2003) (quoting *Brackbill v. Ron Brown Charter School*, 777 A.2d 131, 138 (Pa. Cmwlth. 2001)).  Although an application must show that "the charter school enjoys reasonably sufficient support from the community," it need not demonstrate a threshold level of support among each of the discrete groups, *i.e.*, teachers, parents, students and community members. *Brackbill*, 777 A.2d at 138.

The School District contends that the letters of support offered by Provident were form letters and vague on whether they supported Provident or simply the concept of a school for children with dyslexia.  The School District contends that Provident was required to document specific requests for enrollment information, as well as commitments for contributions from foundations, businesses and elected officials.  We disagree.

That many of the letters of support were form letters is of no moment. It is the *content* of the letters that is significant.  The School District is correct that few of the letters express an intent by the writer to enroll children in Provident. Nevertheless, the letters specifically support Provident, as opposed to the abstract concept of a school for dyslexic children.  Likewise, the petition is specific, *i.e.*, that the signatories "support *the establishment of Provident Charter School for Children with Dyslexia in Pittsburgh[,] PA*."  R.R. 929–940 (emphasis added).

In essence, the School District seeks to impose requirements not found in Section 1717-A(e)(2)(i) of the Charter School Law, *i.e.*, requests for enrollment information, pre-enrollments, contributions from local businesses and letters of support from businesses, foundations or local officials.  This burden is

18

not in the statute, and is unrealistic to expect before a school has a charter. In any case, as we have explained, community support is "not [to be measured] by individual categories." *Carbondale Area School District*, 829 A.2d at 405. Rather, Provident's compliance with Section 1717-A(e)(2)(i) of the Charter School Law is determined by reviewing the evidence it presented in the aggregate. *Carbondale Area School District,* 829 A.2d at 405.

Provident supplied ample support from the community, as was found by the Appeal Board, in the form of multiple petition signatures from individuals residing within a 4-block radius of Provident's proposed site; letters from parents, educators and a student; and appearances at two public hearings.[25] In short, the Appeal Board's finding that Provident demonstrated sustainable support is supported by substantial evidence. *See School District of the City of York v. Lincoln-Edison Charter School*, 772 A.2d 1045, 1049 (Pa. Cmwlth. 2001) (holding that "nothing establishe[d] that [the applicant] did not have the support as required under Section 1717-A(b)(2) of the [Charter School] Law" when it submitted the requisite number of petition signatures).

The School District also challenges the Appeal Board's conclusion that Provident demonstrated sufficient community support by contending that the Appeal Board did not specify its disagreement with the School District's contrary conclusion. Section 1717-A(i)(6) of the Charter School Law directs the Appeal Board to consider a school district's determination and, then, "specifically articulate" its agreement or disagreement. 24 P.S. §17-1717-A(i)(6). "Specific articulation" requires the Appeal Board to do more than recite jargon; its decision

---

[25] Contrary to the School District's assertion, Provident also submitted a letter from a local non-profit corporation indicating support from the business community.

19

must provide guidance to the unsuccessful party regarding the deficiencies in its reasoning. *Community Service Leadership Development Charter School v. Pittsburgh School District*, 34 A.3d 919, 925 (Pa. Cmwlth. 2012).

Provident responds that the "specific articulation" standard in Section 1717-A(i)(6) was intended to assist charter school applicants, so that they can prepare a new and satisfactory application. Otherwise, applicants will be forced to "prepare and resubmit applications, using guess work as a guide." *Community Service Leadership Development Charter School*, 34 A.3d at 924. Provident contends that the standard makes no sense where, as here, the Appeal Board has reversed a school district. We disagree. Section 1717-A(i)(6) of the Charter School Law does not limit the standard to adjudications adverse to charter applicants, and we reject Provident's argument in this regard.

However, the School District makes too much of the phrase "specifically articulate its reasons for agreeing or disagreeing" with the School District. 24 P.S. §17-1717-A(i)(6). The Appeal Board issued a 38-page adjudication with numerous findings of fact, conclusions of law and lengthy discussion. The Appeal Board reversed the School District because it rejected the School District's construction and application of the statute. For the most part, the Appeal Board held that the quantum of explanation and documentation submitted by Provident was sufficient to satisfy the statute. The Appeal Board's explanations did not leave the School District "guessing."

On community support, for example, the Appeal Board explained its disagreement with the School District as follows:

> In both the Original and Revised Application combined, Provident provided approximately sixty (60) letters of support for a charter school that would meet the needs of children with

20

dyslexia. *The Revised Application contains over 100 signatures on a petition from residents within a four-block radius of the proposed school which states that the petition is to support the establishment of Provident Charter School for Children with Dyslexia in Pittsburgh.* At the first public hearing, twenty (20) people spoke in favor of Provident, five (5) of whom were associated with Provident. At the second public hearing on the Revised Application, seven (7) people spoke in favor of Provident, three (3) of whom had spoken at the first public meeting, and some of whom were associated with Provident….

After a review of the record, [the Appeal Board] disagrees with the District Board's findings. Provident gathered support from parents, students, educators, and other professionals. Additionally, that support was shown through numerous signature petitions, letters of support, and at the public hearings.

Appeal Board Adjudication at 25-26 (emphasis added). The Appeal Board sufficiently explained its disagreement with the School District's contrary conclusion on community support. Notably, there were no factual disputes on this point. The Appeal Board, reviewing Provident's application *de novo*, found it sufficient, *i.e.*, the quantum of materials presented demonstrated community support. There is nothing more to say by way of explanation.

Next, the School District contends that the Appeal Board's finding that Provident will provide parents and pupils with expanded choices was not supported by substantial evidence. The School District contends that "[s]tudents in Pittsburgh Public Schools have more opportunities and choice than that which is being proposed by Provident, and there is no evidence of significant uniqueness to Provident's programs." School District Brief at 30.

Section 1702-A(3) of the Charter School Law seeks "to establish and maintain schools that operate independently from the existing school district structure" in order to "[e]ncourage the use of different and innovative teaching

21

methods." 24 P.S. §17-1702-A(3). To this end, charter school applicants must provide information about "[t]he mission and education goals of the charter school, the curriculum to be offered and the methods of assessing whether students are meeting educational goals." Section 1719-A(5) of the Charter School Law, 24 P.S. §17-1719-A(5). To satisfy this burden, a proposed charter school must establish that it "offers a learning environment that is unique and different from that in the District's public schools." *Montour School District v. Propel Charter School-Montour*, 889 A.2d 682, 688 (Pa. Cmwlth. 2006). Even if there are similarities between a proposed charter school and public schools, an applicant will satisfy "the [Charter School Law] when there is substantial evidence of uniqueness." *Id.*

In its revised application, Provident detailed that its educational program will use "multi-sensory instructional methods and individual learning plans," with "specially designed instruction for students with dyslexia that will intensively and specifically address their individual needs at their own instructional level." R.R. 644. Provident submitted an extensive curriculum, hundreds of pages long, and identified its unique features, which were summarized by the Appeal Board. These features include, *inter alia*, teacher looping; the Orton-Gillingham approach to language arts; individualized, targeted instruction; the study of Spanish and Latin; a 6:1 student to adult ratio and a Tae Kwon Do program to develop self-discipline. R.R. 645-46, 963. The Appeal Board rejected the School District's argument that it already offered many of these features. It explained:

> The Revised Application describes a learning environment that is unique and different from that in the District's public schools, particularly with respect to students with dyslexia and other language-based disabilities. *The fact that the District has some programs for students with dyslexia utilizing methods similar to those outlined by Provident is irrelevant to the application*

22

> *review process*.  The record establishes that the educational program for students with dyslexia, as described by the Revised Application, is innovative and distinctive from the District.

Appeal Board Adjudication at 30 (emphasis added).  The Appeal Board then identified the "innovative and distinctive" features of Provident's program.  Appeal Board Adjudication at 29-30.  That Provident intends to offer some programs similar to those offered by the School District matters not.  *Montour School District*, 889 A.2d at 688.[26]  Any charter school will be similar to other public schools because all public schools have to meet the Commonwealth's educational requirements.  No charter school can be completely unique.

The School District contends that the Appeal Board's adjudication did not account for the fact that "there is even less choice for students who would attend Provident than what students elsewhere in the District enjoy."  School District Brief at 37.  There is no record evidence to substantiate this claim.  The School District did not supplement the record before the Appeal Board or provide any evidence about its programs.  The School District cannot now complain that the Appeal Board did not consider evidence not presented to it.[27]

---

[26] The Appeal Board detailed each educational choice and opportunity which Provident proposed and compared them to those the School District claimed (without offering any evidence) that it offered in its denial.  The Appeal Board also acknowledged that some of the programs offered were similar to those of the School District, but others were unique.

[27] We decline to consider the evidence the School District has set forth in its brief regarding the programming in its public schools, which is *de hors* the record.  Despite the ability to supplement the record before the Appeal Board, the School District did not do so.  Because statements in briefs do not constitute evidence of record and were not before the Appeal Board when it rendered its decision, we will not consider them.  *See Erie Indemnity Co. v. Coal Operators Casualty Co.*, 272 A.2d 465, 466–67 (Pa. 1971) ("Apparently, the court took into consideration facts alleged in the briefs, but briefs are not part of the record, and the court may not consider facts not established by the record." (footnotes omitted)).

23

The School District also argues that after Provident revised its admission policy, it had to show that it could meet the needs of children without dyslexia. In this argument, the School District invokes Section 1702-A(2) of the Charter School Law.[28] However, the School District's denial was based upon Section 1717-A(e)(2)(ii) of the Charter School Law.[29] Because the School District did not cite Section 1702-A(2) in its denial of Provident's application (or before the Appeal Board), it cannot be asserted for the first time before this Court. *See Sharp Equipment Co. v. Unemployment Compensation Board of Review*, 808 A.2d 1019, 1026 (Pa. Cmwlth. 2002) ("The litigant must preserve the issue at the administrative agency hearing in order to obtain judicial review."). In short, the School District waived this argument.[30]

The School District next argues that Provident offered "only an aspirational claim that Provident intends to involve [community] groups" in the planning process. School District Brief at 43. The School District no longer argues that an applicant is required to attach agreements, contracts or memoranda of understanding to the application but states that, regardless, Provident has not made a threshold showing because its statement of intent was not specific. We disagree.

---

[28] 24 P.S. §17-1702-A(2) (stating legislative intent that charter schools "[i]ncrease learning opportunities for all pupils").

[29] The petition for review states, "The District based its denial on deficiencies in the following areas: … The applicant failed to demonstrate that it is prepared to meet the needs of all students, [*sic*] (pursuant to 24 P.S. § 17-1717-A(e)(2)(ii))." Petition for Review, ¶8(e).

[30] Likewise, because the Appeal Board was under no obligation to specifically articulate how Provident will increase learning opportunities for all pupils, and because this challenge was not presented to it, we decline to find its decision deficient in this respect.

Section 1719-A(8) of the Charter School Law requires an applicant to provide "[i]nformation on the manner in which community groups will be involved in the charter school planning process." 24 P.S. §17-1719-A(8). The Appeal Board found that many key individuals involved with Provident are actively involved with relevant community groups, *i.e.,* those who advocate for children with learning challenges. Appeal Board Adjudication at 10, Finding of Fact, ¶32. As to community involvement, the Appeal Board found in Provident's revised application that it

> intends to involve parents and guardians of prospective students in the development of Provident, that it intends to initiate partnerships with local, statewide and national organizations to promote best practices based on evidence, expertise and experience, and that it intends to identify business partners or community groups with which it can partner.

Appeal Board Adjudication at 33. The Appeal Board concluded that Provident's information was sufficient.

Section 1719-A(8) does not require written agreements or present involvement of community groups. Rather, it requests only general, forward-looking information "on the *manner* in which" the community "*will be* involved" in school planning. 24 P.S. §17-1719-A(8) (emphasis added). Because there is an inherent level of flexibility in Section 1719-A(8), we defer to the Board's interpretation and application of the provision. *See, e.g., Packer v. Bureau of Professional and Occupational Affairs*, 99 A.3d 965, 969 (Pa. Cmwlth. 2014), *petition for allowance of appeal denied*, 109 A.3d 680 (Pa. 2015) (explaining that

25

courts should defer to the interpretation of an unclear statute given by the agency vested with its enforcement).[31]

It is unrealistic to expect a charter school applicant to have contracts with community groups before the school holds a charter. This Court addressed a similar situation in *Central Dauphin School District v. Founding Coalition of the Infinity Charter School*, 847 A.2d 195 (Pa. Cmwlth.) (*en banc*), *petition for allowance of appeal denied*, 860 A.2d 491 (Pa. 2004). At issue in that case was the Charter School Law's requirement that a charter school applicant name the proposed faculty of the charter school as well as include a criminal history report and an official child abuse clearance for all employees who will have direct contact with students. *See* Section 1719-A(13), (15) and (16), 24 P.S. §17-1719-A(13),(15),(16). Infinity submitted this specific information for two key individuals and included a description of the job qualifications for the other staff positions. This Court found the submitted information to be sufficient, agreeing with the following analysis supplied by the Appeal Board:

> Because a charter school has not yet been established when an applicant seeks a charter, it is unreasonable and unrealistic to expect the charter application to contain the specific names and clearances for all proposed faculty and staff positions…. [T]he approach taken by [Infinity] in its application was appropriate and compliant with the [Charter School] Law. Therefore, [Infinity's] failure to provide specific names and clearances for the school's faculty and staff was not a proper basis for [the school district's] denial of its charter application.

---

[31] The dissent gives no weight to the Appeal Board's judgment about the type and quantum of materials needed to satisfy the requirements for a charter school application. Instead, the dissent construes Section 1719-A(8) to require Provident to "take *some identifiable action*" to partner with community groups. Dissent slip op. at 4 (emphasis original). This vague standard offers no real guidance to applicants, and it is not a standard expressed in the Charter School Law.

26

*Infinity Charter School*, 847 A.2d at 204.

This situation is no different. At the application stage, Provident's statement of intent and manner for involving community groups is all that is required by Section 1719-A(8). The Appeal Board did not err in concluding that the information provided by Provident on community involvement was legally sufficient.[32]

Finally, the School District asserts that the Appeal Board erred in granting a charter to Provident because its admission policy is discriminatory.[33] In addition to challenging the pre-enrollment form, the School District objects to Provident's requests for information from parents about their plans for after-school programs and their interest in Provident. The School District also challenges Provident's requirement that parents go through orientation, arguing that the conduct of a child's parent or guardian is not a charter school's concern. However, the only issue that has been preserved for this appeal is whether the pre-enrollment form is discriminatory. *See Sharp Equipment Co.*, 808 A.2d at 1026.

The School District claims that the pre-enrollment form violates Section 4(a)(2) of the Pennsylvania Fair Educational Opportunities Act because it asks whether the applicant needs special programs. 24 P.S. §5004(a)(2).[34] According to the School District, this question will permit Provident to discriminate in violation of law.

---

[32] Further, the Appeal Board adequately explained its disagreement with the School District's conclusion with respect to community involvement in Provident, *i.e.*, that the statute does not require actual agreement but only an identification of how it will involve community groups.

[33] The Appeal Board did not address the School District's conclusion that Provident's admission policy was invalid under a regulation at 22 Pa. Code §711.7. However, the School District did not pursue this issue before this Court.

[34] The text of Section 4(a)(2) is set forth *infra*.

Provident's proposed pre-enrollment form requests "whether special programs are required." Appeal Board Adjudication at 13, Finding of Fact, ¶42. The Appeal Board found that the purpose of the question was to gather information that Provident could use to be "better prepared to address and work with each student's specific educational needs" and not to discriminate. Appeal Board Adjudication at 35, n.24.

The stated purpose of the Pennsylvania Fair Educational Opportunities Act is to provide "equal opportunities for education." Section 2(a) of the Act, 24 P.S. §5002(a). Section 4(a)(1) prohibits schools from engaging in unfair educational practices, which includes "exclud[ing] or limit[ing], or otherwise discriminat[ing]" in the admission of students on the basis of, *inter alia*, disability. 24 P.S. §5004(a)(1).[35] It is in this context that schools are prohibited from

> mak[ing] any written or oral inquiry prior to admission concerning or designed to elicit information as to the race,

[35] Section 4 states in relevant part, as follows:

(a) Except as provided in section 9, it shall be an unfair educational practice for an educational institution--

(1) *To exclude or limit*, or otherwise discriminate, because of race, religion, color, ancestry, national origin, sex, handicap or disability, against any student or students seeking admission as students to such institutions: Provided, That it shall not be unfair educational practice for any educational institution to use criteria other than race, religion, color, ancestry, national origin, sex, handicap or disability in the admission of students.

(2) To make any written or oral inquiry prior to admission concerning or designed to elicit information as to the race, religion, color, ancestry, national origin, sex, handicap or disability of a student seeking admission to such institution.

24 P.S. §5004(a)(1),(2) (emphasis added).

religion, color, ancestry, national origin, sex, *handicap or disability* of a student seeking admission to such institution.

24 P.S. §5004(a)(2) (emphasis added).

The School District suggests that Section 4(a)(2) imposes a blanket prohibition against asking the question "whether special programs are required." We reject this construction of the statute. Schools may not elicit information to "*exclude or limit, or otherwise discriminate*" against prospective students with disabilities or belonging to other protected classes. 24 P.S. §5004(a)(1) (emphasis added). Notably, Provident seeks to *include,* not "exclude or limit," students with a learning disability. Indeed, Provident will be looking to enroll students with dyslexia and other language-based learning disabilities. The pre-enrollment question will assist Provident's preparation of the special instructional programs it will offer. The Appeal Board so found, as a matter of fact, and this finding supports the conclusion that the question on the pre-enrollment form does not violate Section 4(a) of the Pennsylvania Fair Educational Opportunities Act.[36] The Appeal Board offered a specific and cogent explanation of its disagreement with the School District on this point:

> Because the information [whether special programs are required] will not be used to determine eligibility of admission, [the Appeal Board] finds that gathering information to be better prepared for the student population is permissible.

---

[36] The dissent contends that Provident's admission policy is discriminatory. The dissent ignores the Appeal Board's relevant factual findings. It found that Provident's enrollment is open to all students on a first-come, first-served basis and by lottery if there are too many applicants. The Appeal Board also found that the question about special programs will be used to prepare for each student's special requirements, not to discriminate. The Appeal Board's factual findings are conclusive and cannot be overturned by this Court.

Appeal Board Adjudication at 35, n.24.[37]

## Conclusion

In sum, the Appeal Board did not err in holding that Provident met its burden of satisfying the criteria for a charter. Provident demonstrated that it has sustainable support; will provide parents and pupils with expanded educational choices; will provide comprehensive learning experiences to students; and explained the manner in which community groups will be involved in its planning process. Finally, Provident's admission policy complies with applicable law. Further, the Appeal Board adequately articulated the reasons why it disagreed with the School Board's contrary conclusion with regard to each of these determinations.

Accordingly, the order of the Appeal Board is affirmed.

_____
MARY HANNAH LEAVITT, Judge

---

[37] Further, even if the Pennsylvania Fair Educational Opportunities Act prohibited Provident from asking about a student applicant's need for special programs for any purpose, Provident's charter application would not be denied. Provident agreed to remove the question from its pre-enrollment form in the event this Court would conclude that the question is legally impermissible. Provident's Brief at 40 n.8. At most, then, a remand to the Appeal Board to approve the charter application with the condition that Provident remove the question from the pre-enrollment form would have been necessitated.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

School District of Pittsburgh, : 
              Petitioner : 
                          : 
           v. :   No. 598 C.D. 2015
                          : 
Provident Charter School For : 
Children With Dyslexia, : 
              Respondent : 

# **O R D E R**

AND NOW, this 26th day of February, 2016, the order of the State Charter School Appeal Board dated March 17, 2015, in the above-captioned matter granting a charter to Provident Charter School for Children with Dyslexia is hereby AFFIRMED.

                                _____

                                MARY HANNAH LEAVITT, Judge

IN THE COMMONWEALTH COURT OF PENNSYLVANIA


School District of Pittsburgh,     :
               Petitioner    :
                               :
        v.                  :
                               :
Provident Charter School For     :
Children With Dyslexia,        :   No. 598 C.D. 2015
               Respondent :   Submitted: December 9, 2015


BEFORE:    HONORABLE DAN PELLEGRINI, President Judge
               HONORABLE BONNIE BRIGANCE LEADBETTER, Judge
               HONORABLE RENÉE COHN JUBELIRER, Judge
               HONORABLE ROBERT SIMPSON, Judge
               HONORABLE MARY HANNAH LEAVITT, Judge
               HONORABLE P. KEVIN BROBSON, Judge
               HONORABLE PATRICIA A. McCULLOUGH, Judge


DISSENTING OPINION BY
PRESIDENT JUDGE PELLEGRINI           FILED: February 26, 2016


       The central issue in this case is whether Provident Charter School for Children With Dyslexia's (Provident) revised application to establish a charter school satisfied the Charter School Law (CSL).[1] While I agree with the majority that Provident established demonstrated, sustainable support under the loose standard that we have established,[2] expanded choices in education opportunities,

---

[1] Act of March 10, 1949, P.L. 30, added by Section 1 of the Act of June 19, 1997, P.L. 225, *as amended*, 24 P.S. §§17-1701-A–17-1751-A.

[2] A charter school applicant, among other things, is required to prove "demonstrated, sustainable support" for the charter school plan by teachers, parents, community members and students as required by Section 1717-A(e)(2)(i) of the CSL, 24 P.S. §17-1717-A(e)(2)(i). In **(Footnote continued on next page…)**

and its capability to provide comprehensive learning experiences to students, at least under the lenient standards we have enunciated in the past, I disagree with the majority's decision to allow Provident to "slide" on other mandatory provisions set forth in the CSL. Requiring strict compliance after all will insure that Charter School Boards and private management companies hired to operate their schools have properly met the standard set forth in the CSL for the protection of students entrusted to those entities.

Specifically, for the reasons that follow, I would find that: (1) Provident offered insufficient evidence of the manner in which community groups will be involved in its planning process; and (2) Provident's admission policy violates applicable law. Because an application to establish a charter school must satisfy all the criteria mandated by Section 1719-A of the CSL, 24 P.S. §17-1719-

---

**(continued…)**

determining whether an application has established demonstrated, sustainable support, we have given great leeway to the Board by saying that, notwithstanding that support has to be in all areas, support "is to be measured in the aggregate and not by individual categories" and concluded that "[f]ailure to demonstrate strong support in any one category is not necessarily fatal to charter school application." *Brackbill v. Ron Brown Charter School,* 777 A.2d 131, 138 (Pa. Cmwlth. 2001) (quoting and approving the CAB's interpretation proffered in that case).

In this case, the evidence of support is, for the most part, from letters or names on a petition that support the generalized notion that a charter school for dyslexic children is a good idea. In *Carbondale Area School Dist. v. Fell Charter School*, 829 A.2d 400 (Pa. Cmwlth. 2003), a decision that I would reverse, we seemed to indicate that generalized petitions of support was sufficient to meet this standard. However, by allowing generalized letters of support that can be obtained outside a supermarket on a Saturday morning to meet this provision, we are reading out the requirement that the support has to be "sustainable" that the General Assembly required before an applicant could receive a charter.

A, I would reverse the Charter Appeal Board's (CAB) order granting a charter to Provident.

**I.**

With respect to the requirement in Section 1719-A(8) of the CSL that applicants provide "[i]nformation on the manner in which community groups will be involved in the charter school planning process," 24 P.S. §17-1719-A(8), I find Provident's application deficient.

Provident specified that its coalition and board of directors consists of representatives associated with the following organizations: the International Dyslexia Association, the Pittsburgh Branch of the International Dyslexia Association, the Masonic Temple's Total Learning Center, The Watson Institute and The Laughlin Center. While personal associations with these groups may be some indicia that they will have involvement in Provident's planning, there is nothing of record to indicate that the coalition or board members participate in these organizations in any type of representative capacity. Therefore, without more, their associations are largely irrelevant to determining if Provident has submitted evidence regarding *its* proposed partnerships.

Further, I agree with the School District of Pittsburgh that Provident's statements of generalized intent are too vague to provide guidance regarding how it will integrate community partnerships into the school to enhance and support the learning environment. For example, Provident's assertion that it "will work to engage and involve parents, families and community members to promote

DRP - 3

collaboration, communication and conflict resolution," does little aside from restating the general requirement that community groups must be involved in Provident's planning. (Reproduced Record at 970a.) Although Provident does detail some steps it will take to initiate these partnerships—i.e., notifying local schools of its programs through letters, following up with personal phone calls, inviting representatives to visit and tour, and identifying opportunities for partnerships—it provides only speculation regarding what these partnerships will actually consist of and with whom they will exist.

Section 1719-A(8) of the CSL, although flexible, requires more. It does not request information regarding the steps charter schools plan to take to identify opportunities for partnerships, but rather, seeks information regarding the partnerships with community groups themselves. In other words, to satisfy this provision, I would find it unnecessary for Provident to negotiate the terms of its agreements with community partners, but it must take *some identifiable action* that could lead to arrangements with community partners. The majority's holding provides no standards in this regard. Because the record is devoid of any information regarding specific entities with which Provident seeks to partner and any concrete methods for integrating community involvement above aspirational goals, I find the CAB's conclusion that Provident satisfied Section 1719-A(8) of the CSL unsupported by substantial evidence.

## II.

Regardless, Provident's proposed admission policy and criteria for evaluating the admission of students did not satisfy Section 1723-A(b)(1) of the

CSL[3] because it expressly violated the Pennsylvania Fair Educational Opportunities Act[4] insofar as Provident's pre-enrollment form inquired "whether special programs are required" because the requested information "serves no legitimate purpose at the pre-enrollment phase." (R.R. at 1764a.)

While Provident's intentions with regard to its admissions policy may be laudable in that it claims it seeks this information to better prepare for and serve its student population, its pre-enrollment form does not comply with the express language of Section 4(a)(2) of the Pennsylvania Fair Educational Opportunities

---

[3] Pursuant to Section 1723-A(b)(1) of the CSL:

> (b)(1) A charter school shall not discriminate in its admission policies or practices on the basis of intellectual ability, except as provided in paragraph (2), or athletic ability, measures of achievement or aptitude, status as a person with a disability, proficiency in the English language or any other basis that would be illegal if used by a school district.

24 P.S. §17-1723-A(b)(1).

[4] Act of July 17, 1961, P.L. 776, *as amended*, 24 P.S. §§5001–5010. Specifically, Section 4(a)(2) of the Pennsylvania Fair Educational Opportunities Act states:

> (a) Except as provided in section 9, it shall be an unfair educational practice for an educational institution--
>
> * * *
>
> (2) To make any written or oral inquiry prior to admission concerning or designed to elicit information as to the race, religion, color, ancestry, national origin, sex, handicap or disability of a student seeking admission to such institution.

24 P.S. §5004(a)(2).

Act, which imposes a blanket prohibition on seeking such information pre-admission and renders an institution's reason for seeking such information irrelevant. 24 P.S. §5004(a)(2). In interpreting Section 4(a)(2) to prohibit such inquiries only if used for the purposes of discriminating, the majority conflates the requirements of Sections 4(a)(1) and (2), each of which set forth separate prohibitions, and suggests that the express language of Section 4(a)(2) be ignored to further the purpose of the Pennsylvania Fair Educational Opportunities Act.

For good reason, Section 4(a) does not make the intent of a charter school applicant relevant. Rather than directing the courts to discern the subjective intent behind such inquiries, the General Assembly has outright banned them, a prohibition that the majority excuses by saying that, while illegal, the Charter School Board found that Provident really did not mean it. Moreover, regardless of Provident's intent, this inquiry does not serve student needs at the pre-enrollment stage because applicants submitting the pre-enrollment form have not yet been accepted for enrollment and, in fact, are not enrolling.

In this case, the pre-enrollment form specifically requests whether special-needs programs are required. The information requested on the pre-enrollment form is collected before a student's admission and, therefore, Section 4(a)(2) of the Pennsylvania Fair Educational Opportunities Act applies, barring such inquiries. 24 P.S. §5004(a)(2).

Accordingly, I would reverse the CAB's findings that Provident offered sufficient evidence of the manner in which community groups will be

involved in its planning process and that its admission policy complies with applicable law.

_____
DAN PELLEGRINI, President Judge